UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

A.F. BY AND THROUGH HIS PARENTS, J.F. & L.F.  CIVIL ACTION

VERSUS  NO. 23-7426

ST. TAMMANY PARISH SCHOOL BOARD  SECTION "L" (1)

ORDER & REASONS

 Before the Court is Defendant's Motion for Summary Judgment. R. Doc. 65. Plaintiff opposes the motion. R. Doc. 72. The Court heard oral argument on the motion on Wednesday, April 9, 2025. Subsequently, each side also submitted supplemental briefing regarding a potential continuance of the case. R. Doc. 78 (Plaintiff's brief); R. Doc. 79 (Defendant's brief). Considering the record, the briefing, the arguments, and the applicable law, the Court now rules as follows.

I.  BACKGROUND

 This case arises out alleged abuse of a student by school staff. The student, A.F. is a blind and autistic child who attends Mandeville Middle School ("MMS"). R. Doc. 10 at 3-4. At the time of these incidents, A.F. was eleven years old. R. Doc. *Id.* at 2. Because of his blindness and autism, which Plaintiffs assert are disabilities under both federal and state law, he is accompanied throughout the school day by a paraprofessional, who is an employee of the school district. *Id.* Plaintiffs claim that on January 30, 2023, A.F. was abused by various paraprofessional staff in three different incidents: (1) Tiffany Bourgeois kicked him (2) Angela Rayer shoved him and hit him in the face with a walkie talkie and (3) Leslie Cookmeyer pushed his head into the cafeteria table. *Id.* Video security footage submitted to the Court from the day of January 30, 2023 shows that all of the alleged incidents occurred within a ten-minute period between approximately 11:14

1

A.M and 11:24 A.M. as the paraprofessionals escorted A.F. from his classroom through the school hallways and into the cafeteria. R. Doc. 71.

Plaintiffs learned about the first incident through a school resource officer, who reportedly had witnessed it through the security footage. *Id.* at 3. The officer stated that while A.F. and paraprofessional Tiffany Bourgeois were standing in the hallway, it appeared that A.F. accidentally made contact with Bourgeois' leg with his cane. She responded by kicking A.F. in the leg and stating, "There. Now you know how it feels." *Id.* A.F. contends that another school official had observed this incident as well and timely reported it to the school's principal, Cheryl Barton. *Id.*

The second incident, which allegedly occurred moments after the first, involved a different paraprofessional, Angela Rayer. *Id.* A.F.'s complaint states that Rayer took A.F.'s walking cane and refused to give it back. *Id.* at 4. She then began "forcefully grabbing A.F's fingers" and tried to "pull him down the hallway." When A.F. "resisted being dragged down the hallway," Rayer "intentionally hit A.F. in the face with her walkie talkie." *Id.*

The same day, another aide, Leslie Cookmeyer, allegedly "slammed" A.F.'s head into the cafeteria table where he was eating lunch. *Id.* at 3. At the time, A.F. states that he was engaging in a "stimulation" behavior, commonly known as "stimming," which occurs because of his autism. *Id.* A.F. contends that he was rocking back and forth while eating his lunch, and Cookmeyer got frustrated and "slammed" his head on the table to "get him to stop." *Id.* Another employee allegedly witnessed this incident and also reported it to Principal Barton. *Id.*

Plaintiffs allege that school officials placed Bourgeois on administrative leave on the same day that the first incident occurred. *Id.* Following an administrative investigation, Bourgeois was allegedly asked to resign, and she did. *Id.* However, Plaintiffs aver that Rayer and Cookmeyer were not immediately sanctioned and, as a result, remained with A.F. for several more weeks. *Id.*

2

Later administrative investigations into their conduct led to school officials asking them to resign as well. *Id.* Plaintiffs notes that the school board accepted the resignations of all three paraprofessionals on March 9, 2023. *Id.*

Plaintiffs contend that they were notified by the school on the day of the incidents yet were merely told that A.F. was "love tapped" by a school employee, and there was nothing to be concerned about. *Id.* at 5. Plaintiffs allege that Principal Barton only referenced one of the three incidents that day, and because it was intentionally downplayed, they did not think to investigate the matter more closely. *Id.* In February 2023, Plaintiffs learned that the three paraprofessionals— Bourgeois, Rayer, and Cookmeyer—had suddenly resigned, which prompted them to inquire further into the January 31, 2023 incident. *Id.*

Plaintiffs state that when they asked Principal Barton why she did not tell them about the other two incidents from that day, she said that she must have forgotten about them. *Id.* Additionally, Plaintiffs aver that Principal Barton told a teacher not to speak with anyone about the incidents because she was going to handle it. *Id.* at 6. Plaintiffs claim that they asked MMS for the security footage from that day, but Principal Barton made excuses as to why she could not obtain it. *Id.* After Plaintiffs lodged several more requests, Assistant Superintendent Kimberly Gardner told them that the footage had been deleted as more than thirty-one days had passed since the incident occurred. *Id.* However, Plaintiffs aver that this was a lie, and St. Tammany Parish School Board in fact intentionally withheld the videos for nearly two years. *Id.* at 7.

Plaintiffs sued St. Tammany Parish School Board as a result of the incidents at MMS. R. Doc. 56. In their Second Amended Complaint, Plaintiffs state eight causes of action on A.F.'s behalf against St. Tammany: (1) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; (2) violation of Louisiana's analogous disability statute, the Louisiana Human

Rights Law ("LHRL"), La. Rev. Stat. § 51:2247; (3) a § 1983 claim for violation of substantive due process; (4) a § 1983 claim for use of excessive force; (5) a § 1983 claim for violation of equal protection rights; (6) state law battery and (7) state law negligence. *Id.* at 9-11. Furthermore, A.F's parents also bring a negligence claim and intentional infliction of emotional distress claim on their own behalf arising out of Defendant's alleged withholding of the video footage. *Id.* at 12. Plaintiffs have not sued the three paraprofessionals.

On April 25, 2024, the Court denied Defendant's 12(b)(6) motion to dismiss the case. R. Doc. 22. The Court held that Plaintiffs' allegations that school employees kicked A.F., hit him with a walkie talkie, and slammed his head into the table were sufficient to state claims for disability discrimination, excessive force, violations of due process and equal protection, battery, and negligence for which the School Board could potentially be held liable. *Id.* Further, the Court explained that "many of the facts [Defendant] claimed A.F. must include in his complaint are within the exclusive control and custody of [Defendant], such as whether the paraprofessionals had a history of similar conduct at this school or others." *Id.* at 9-10.

On February 12, 2025, the St. Tammany Parish Sheriff's Office arrested Bourgeois, Rayer, and Cookmeyer. R. Doc. 72-24 at 2. They face charges of "simple battery of persons with infirmities" in violation of Louisiana Revised Statute § 14:35.2 for their treatment of A.F. *Id.*

## II.    PRESENT MOTION

Defendant moves for summary judgment as to all of Plaintiffs' claims. R. Doc. 65. First, Defendant avers that Plaintiffs' § 1983 claims must be dismissed because settled Fifth Circuit case law holds that corporeal punishment of students does not rise to the level of a constitutional violation. R. Doc. 65-1 at 9-18. Moreover, Defendant argues that even if Plaintiffs could establish that the paraprofessionals committed constitutional violations, Plaintiffs' § 1983 claims still must

be dismissed because Plaintiffs cannot impute liability to the School Board for such violations under the exacting standards for municipal liability. *Id.* at 18. Second, Defendant contends that Plaintiffs' claims for disability discrimination in violation of the ADA and the LHRL must be dismissed because Plaintiffs failed to prove that the paraprofessionals treated A.F. differently than his peers based on his disability. *Id.* at 8-9. Third, Defendant argues that Plaintiff has failed to prove facts sufficient to support a verdict in their favor as to their state law claims for (1) battery, (2) negligent training, and (3) intentional infliction of emotional distress. *Id.* at 20-24. Moreover, Defendant argues that it is entitled to immunity as to all Plaintiffs' state-law claims. *Id.* at 7.

Plaintiffs oppose the motion, arguing that Defendants fundamentally mischaracterize and downplay the severity of the incidents depicted in the video footage. R. Doc. 72. They aver that they have in fact, proven the facts alleged in their complaint, meaning that they should necessarily prevail on summary judgment as to each of their claims. *Id.* at 11.

Finally, each party addresses the possibility of a continuance of the case. Defendant requests that the Court stay the instant civil proceeding pending the conclusion of the criminal proceedings against Bourgeois, Rayer, and Cookmeyer. R. Doc. 79. Plaintiffs consent to a brief continuance of the trial date. R. Doc. 78. However, they oppose a stay or any lengthy continuance contingent on the conclusion of the criminal proceedings. *Id.*

## III.    LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022) "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

## IV. LAW & ANALYSIS

Here, the parties dispute whether the instant civil case may go forward before the conclusion of the criminal proceedings against the paraprofessionals. Further, the parties dispute whether summary judgment is appropriate as to Plaintiffs': (1) § 1983 claims for violations of substantive due process, use of excessive force and denial of equal protection; (2) claims for disability discrimination under the ADA and LHRL; and (3) state law claims for battery, negligent hiring, and intentional infliction of emotional distress. Because the reasons for continuing the case—and the effect of such continuance—interact with Defendant's request for summary judgment on several claims, the Court first addresses the continuance. Next, the Court takes each category of claims in turn.

### A. The Court Will Continue the Case.

Plaintiffs' claims all arise out of the alleged abuse perpetrated by the three paraprofessionals. Although these paraprofessionals are not actually defendants in this case, their behavior underlies the suit. However, all three women are facing criminal charges. They have not yet been deposed. Accordingly, there appears to be a strong likelihood that should the Court allow

the trial to go forward before the criminal proceedings have resolved, the paraprofessionals would invoke the Fifth Amendment and refrain from testifying.

Indeed, Defendant avers that it would be prejudiced should the Court allow the instant civil case to go forward before the criminal proceedings have concluded. R. Doc. 79. It argues that:

> [I]f the paraprofessionals attend the trial and assert their rights under the Fifth Amendment to the U.S. Constitution, [Defendant] will be prejudiced in the trial as the witnesses will not be able to provide accurate testimony. As an example, the paraprofessionals could be asked whether they intentionally struck the child, and that individual would merely be able to state that they "plead the Fifth." This type of testimony would not provide the jury with any insights on intent, nor would the paraprofessionals be able to offer an explanation for their behavior.

R. Doc. 79 at 2. Accordingly, Defendant requests that this Court stay the instant case pending resolution of the criminal proceedings.

Plaintiffs, however, contend that the Court need not wait until the conclusion of the criminal proceedings to try the instant civil matter. R. Doc. 78. Rather, Plaintiffs argue that they can simply call the paraprofessionals to testify despite the ongoing criminal proceedings against them. *Id.* at 2. Specifically, Plaintiffs urge that if the paraprofessionals invoke the Fifth Amendment, the Court should merely instruct the jury that they may draw an "adverse inference" against Defendant based on the witnesses' refusal to testify. *Id.*

The Court finds that this case must be continued pending resolution of the criminal proceedings against the paraprofessionals. Plaintiff is correct that "it is well-settled that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). However, "[i]n general, the decision as to whether to admit a person's invocation of the Fifth Amendment into evidence is committed to the discretion of the district court." *FDIC v. Fid. & Deposit Co.*, 45 F.3d

969, 977 (5th Cir. 1995). That is, such evidence, while admissible, is still subject to the balancing test laid out in Federal Rule of Evidence 403. *See Hinojosa*, 547 F.3d at 294 ("[A] witness's invocation may be so prejudicial in certain circumstances as to warrant its exclusion under Rule 403."). More specifically, the Fifth Circuit has cautioned that "[t]he assertion of the privilege, particularly on the advice of counsel, is an ambiguous response . . . The jury is not likely to realize that the innocent may invoke." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210-11 (5th Cir. 1983). Here, the Court is persuaded by Defendant's argument that it will be unfairly prejudiced if the three key witnesses, who are under active criminal prosecution, take the stand and plead the Fifth. In this particular case, as illustrated below, the presence of discriminatory intent on the part of the paraprofessionals and the full context of the incidents displayed in the video footage will be key to the jury's fair and informed decision.

However, although the Court will stay the case, the Court does not find that an indefinite stay is appropriate. Rather, the Court will stay the suit for 90 days, after which time the parties may update the Court on the status of the criminal proceedings and request an extension of the stay if appropriate. The Court will monitor the progress of the underlying criminal proceedings through regular status conferences to ensure that this matter proceeds to trial as soon as possible.

With this background in mind—the fact that key witness testimony is still outstanding and that the case may not go forward in the near future—the Court moves on to address Defendant's pending motion for summary judgment.

**B. Plaintiffs' § 1983 Claims are Not Viable at This Time.**

Here, Plaintiff seeks to hold the School Board liable under § 1983 for alleged constitutional violations perpetrated by its employees, the three paraprofessionals. There are two steps involved in bringing a successful § 1983 claim against a municipality such as a school board. First, the

plaintiff must show that the employees in question actually violated the plaintiff's constitutional rights. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). Second, the plaintiff must show that a specific "policy or custom" enacted by the municipality itself was the "moving force" of the particular constitutional violation. *Id.* That is, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur*." Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

With that in mind, the Court examines each issue in turn: (1) whether Plaintiffs have a viable claim that the paraprofessionals violated A.F.'s constitutional rights and (2) if so, whether they have shown that the School Board could be held liable for any of these violations under the stringent requirements of municipal liability. Ultimately, the Court concludes that although genuine issues of fact exist as to the first issue—the underlying constitutional violations— Plaintiffs have not yet presented sufficient evidence to create a genuine issue as to whether such conduct is "directly attributable" to the School Board. *Id.*

### i. The Underlying Constitutional Violations

"To state a claim under 42 U.S.C. § 1983, a plaintiff must first show a violation of the Constitution or of federal law." *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 413 (5th Cir. 2021). Plaintiffs allege that the paraprofessionals violated A.F.'s constitutional rights in three ways: infringing his right to bodily integrity, using excessive force, and denying him equal protection. Defendant disagrees and argues that the high bar for § 1983 claims in school abuse cases warrants summary judgment. The Court examines each constitutional violation in turn.

### 1. Fourteenth Amendment Due Process and Fourth Amendment Excessive Force

"It is well-established in this circuit that 'corporal punishment in public schools implicates a constitutionally protected liberty interest' under the Fourteenth Amendment." *T.O.*, 2 F.4th at

413-14.  Usually, when a plaintiff brings both a Fourteenth Amendment due process claim *and* a Fourth Amendment excessive force claim, the court examines the claims together through the lens of the Fourteenth Amendment. *See id.* ("The Fourth Amendment is applicable in a school context. In [the Fifth] Circuit, however, claims involving corporal punishment are generally analyzed under the Fourteenth Amendment."); *Flores v. Sch. Bd. of DeSoto Par.*, 116 F. App'x 504, 510 (5th Cir. 2004) (explaining that "permitting students to bring excessive force claims under the Fourth Amendment would eviscerate" the established process for analyzing substantive due process violations in the school context).

Overall, the Fifth Circuit has set a high bar for § 1983 due process / excessive force cases in the school context. The key issue in such cases is determining whether the teacher's behavior qualifies as mere "corporeal punishment" or whether the behavior crosses the line into something more sinister. "Corporeal punishment" is defined by the Fifth Circuit as "discipline [] for the purpose of maintaining order and respect." *Flores*, 116 F. App'x at 510. In *Fee v. Herndon*, the court explained that where the teacher's behavior constitutes mere "corporeal punishment," a plaintiff may not bring a § 1983 suit for a constitutional violation. 900 F.2d 804, 808 (5th Cir. 1990). Rather, they must rely on state law remedies:

> [I]njuries sustained incidentally to corporal punishment, irrespective of the severity of these injuries or the sensitivity of the student, do not implicate the due process clause if the forum state affords adequate post-punishment civil or criminal remedies for the student to vindicate legal transgressions. The rationale for this rule, quite simply, is that such states have provided all the process constitutionally due.

The Fifth Circuit has already found that Louisiana indeed affords adequate state law remedies to plaintiffs for claims arising from corporal punishment by teachers. *See Flores*, 116 F. App'x at 509 ("We have previously held that the State of Louisiana affords students an adequate remedy through its tort law and statutory provisions in Title 17."). Thus, "corporeal punishment" is not actionable under § 1983 pursuant to existing Fifth Circuit case law.

10

In contrast, however, behavior that goes *beyond* mere corporeal punishment can sustain a § 1983 claim. For example, a "malicious and unprovoked attack,"—that is, an attempt to "cause harm to the student for no legitimate pedagogical purpose"—does *not* qualify as corporeal punishment and can thus support a § 1983 claim. *Flores*, 116 F. App'x at 510. Put another way, a teacher's behavior is actionable under § 1983 when it is "arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning." *Woodard v. Los Fresnos Indep. Sch. Dist.*, 732 F.2d 1243, 1246 (5th Cir. 1984).

The Fifth Circuit has summarized its application of this precedent as follows:

> [W]e have consistently dismissed substantive due process claims when the offending conduct occurred in a disciplinary, pedagogical setting. For example, we dismissed substantive due process claims (1) when a student was instructed to perform excessive physical exercise as a punishment for talking to a friend; (2) when a police officer slammed a student to the ground and dragged him along the floor after the student disrupted class; (3) when a teacher threatened a student, threw him against a wall, and choked him after the student questioned the teacher's directive; (4) when an aide grabbed, shoved, and kicked a disabled student for sliding a compact disc across a table; and (5) when a principal hit a student with a wooden paddle for skipping class.
>
> In contrast, we have allowed substantive due process claims against public school officials to proceed when the act complained of was 'arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.' For example, we held that a substantive due process claim could proceed when a teacher allegedly molested a student, and when a teacher tied a student to a chair for two days as part of an experimental technique. We allowed those claims to proceed because, unlike disciplinary measures, these alleged acts were 'unrelated to any legitimate state goal.'

*T.O.*, 2 F.4th at 414 (internal citations omitted).

Defendant contends that this precedent shows that no underlying due process or excessive force violation was committed against A.F. R. Doc. 65. It maintains that like the students in the cases where the Court found inactionable "corporeal punishment," A.F. was misbehaving at the

11

time of the incidents. That is, Defendant contends that A.F. provoked the teachers by hitting Bourgeois in the leg with his cane, struggling with and attempting to bite Rayer, and engaging in "hand fighting" with Cookmeyer. *Id.* Thus, Defendant asserts that the paraprofessional's actions were "legitimate, though inappropriate, attempts to prevent disruptive behavior." *Id.* at 18.

Plaintiffs argue that the Fifth Circuit case law summarized above, holding that corporeal punishment of children is categorically not actionable under § 1983, has in fact recently been abrogated. R. Doc. 72 at 22. They observe that in 2017, Louisiana passed a statute banning *any* corporeal punishment of children with disabilities. *See* La. R.S. § 17:416.1(B)(1). ("No form of corporal punishment shall be administered to a student with an exceptionality"). They thus argue that "[b]ecause Louisiana has made a policy choice that any amount of corporal punishment against disabled children is *per se* unreasonable, the conduct here is no longer 'related to the legitimate state goal of maintaining an atmosphere conducive to learning.'" R. Doc. 72 at 22 (quoting *T.O.*, 2 F.4th at 414).

Moreover, elsewhere in their brief, Plaintiffs challenge Defendant's interpretation that A.F. was misbehaving at the time of the incidents. R. Doc. 72 at 3. They argue that video from A.F.'s classroom shows that the sequence of events begins when Rayer pushes A.F. out of the door of the classroom into the hallway without any provocation. *Id.* at 3. They argue that A.F. only accidentally touched Bourgeois' leg with his cane. *Id.* Rayer then attacked A.F. by grabbing his cane, striking him with it, and, per deposition testimony of witnesses, saying "how does that feel?" *Id.* As to the third incident in the cafeteria, Plaintiff alleges that Cookmeyer's pushing A.F.'s head into the table is "inexplicable" given that she had finished guiding him to the table and he was seated and ready to eat lunch. *Id.* at 7. Thus, overall, Plaintiffs seem to allege that the paraprofessionals' actions were a "malicious and unprovoked attack" rather than corporal

punishment "intended to discipline the student for the purpose of maintaining order and respect." *Flores*, 116 F. App'x at 509.

Here, the Court finds that genuine issues of material fact exist on the issue of whether the paraprofessionals violated A.F.'s constitutional rights to bodily integrity and freedom from excessive force. Preliminarily, the Court observes that there may be some merit in Plaintiffs' argument that Louisiana's passage of a law rejecting corporeal punishment for disabled children undermines prior Fifth Circuit cases holding that "corporeal punishment" is categorically not actionable under § 1983 regardless of how disproportionate the teacher's abuse is to the student's misbehavior. The Court is sympathetic to Plaintiffs' argument that law and attitudes regarding the physical punishment of schoolchildren, particularly disabled school children, have been meaningfully altered since this line of case law developed in the late 1970s. *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651 (1977) (originating the "corporeal punishment" distinction).

However, the Court ultimately does not reach this issue because it finds that even under the existing case law described above, issues of material fact persist. Essentially, the case law turns on whether the student was misbehaving at the time of the teacher's attack. *See T.O.*, 2 F.4th at 414. If so, the teacher's behavior is deemed non-actionable corporeal punishment. *Id.* However, if the teacher's actions are "malicious and unprovoked," § 1983 is still in play. *See Flores*, 116 F. App'x at 509. Crucially, the parties dispute whether A.F. was misbehaving. Defendant argues that A.F.'s actions triggered the incidents because he hit Bourgeois with his cane, tried to bite Rayer, and engaged in "hand fighting" with Cookmeyer. Plaintiffs, meanwhile, aver that Rayer initiated the sequence of events by pushing A.F. out the classroom door for no apparent reason. They argue that A.F., who is blind, was reasonably sweeping his cane when he inadvertently touched Bourgeois' leg. And they aver that Cookmeyer's head push was completely "unprovoked."

The Court has viewed the video in question and finds that it is susceptible to both interpretations. Therefore, fact issues persist as to whether A.F.'s behavior was in fact "unwarranted." *Marquez v. Garnett*, 567 F. App'x 214, 215 (5th Cir. 2014). Accordingly, fundamental fact issues preclude the Court from granting summary judgment on Plaintiffs' failure to show a genuine issue of fact as the these constitutional violations.

### 2. Equal Protection

The parties also dispute whether the paraprofessionals denied A.F.'s constitutional right to equal protection. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An equal protection claim can be sustained "even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called "class of one." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008). This is because "[w]hether the complaint alleges a class of one or of five is of no consequence . . . the number of individuals in a class is immaterial for equal protection analysis." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 n.1 (2000). Rather, a plaintiff must simply show that he has (1) "been intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." *Id.*

Defendant avers that there is no evidence that A.F. was treated worse than other students. R. Doc. 65-1 at 18. Moreover, it argues that to the extent that A.F. was treated differently, this was rationally related to "maintaining order at MMS and correcting inappropriate behavior." *Id.*

Again, the Court finds that fact issues underlie the question of whether the paraprofessionals violated A.F.'s right to equal protection. In some cases, the Fifth Circuit has

dismissed equal protection claims on the basis that the plaintiff has failed to adequately show a causal connection between the plaintiff's disability and the teacher's maltreatment. For example, in *S.B. on behalf of S.B. v. Jefferson Parish School Board*, the autistic eleven-year-old plaintiff pinched and kicked at her teachers unprovoked, and the teachers responded by smacking her wrists. No. 22-30139, 2023 WL 3723625, at *4 (5th Cir. May 30, 2023), *cert. denied*, 144 S. Ct. 562 (2024). The court dismissed the plaintiff's equal protection claims, explaining that "although [plaintiff's] autism was the root cause of her disability," which caused her to pinch and kick at her teachers, it could not automatically "be inferred" that the teachers' reactions were "influenced by her disability." *Id.*

However, where a teacher is abusing certain disabled children with higher-than-normal needs but not other less-disabled or non-disabled children, summary judgment is often not appropriate. *See H.M. v. Bd. of Educ. of the Kings Loc. Sch. Dist.*, 117 F. Supp. 3d 992, 1003 (S.D. Ohio 2015) ("It also is reasonable to infer from the alleged facts that the treatment was solely due to Plaintiff-children's multiple handicaps without any rational relationship to a legitimate governmental purpose and that non-disabled students were not treated in the same manner."); *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437, 457 (M.D. Pa. 2007) (plaintiff had a viable claim where he "alleged that Defendant [] repeatedly discriminated against the Minor–Plaintiff and other autistic students in her class by inflicting physical and emotional abuse upon them but did not so discriminate against her other special education students.").

Plaintiff has indeed offered evidence that the paraprofessionals' abuse was causally related to A.F.'s disabilities. Here, Plaintiffs aver that A.F. is significantly disabled in that he is completely blind, non-verbal, and autistic. R. Doc. 72-3 at 3-4. The Court has reviewed the video footage and agrees with the Plaintiffs that it does not appear that the paraprofessionals were abusing the other

students. And most importantly, Plaintiffs offer evidence specifically connecting the paraprofessionals' abuse to A.F.'s disabilities. For example, they argue that video evidence shows that A.F's blindness and use of a cane caused him to accidentally touch Bourgeois' leg, prompting her kick. R. Doc. 72 at 4. They also aver that his autism and "stimming" behaviors prompted the incidents with Rayer and Cookmeyer. Further, Plaintiffs offer testimony of Shannon White, a behavior technician who witnessed the incidents, who stated that Rayer was "way too rough physically w/ *certain* autistic / impaired children" and that, during the incident, she "told [A.F.] who is blind w/ a cane to 'figure out how to walk by himself.'" R. Doc. 72-8 at 3 (emphasis added). Finally, Plaintiffs present evidence of emotional abuse, such as the paraprofessionals calling A.F. "ridiculous" and "bad," and preventing other teachers from even speaking to him. R. Doc. 72 at 5. Accordingly, the Court finds that Plaintiff has raised a genuine issue of fact as to whether the paraprofessionals targeted A.F. on the basis of his disabilities.

### ii. *Monell* Liability: Failure to Train

As explained above, fact issues preclude the Court from deciding whether the paraprofessionals violated A.F.'s constitutional rights to bodily integrity, freedom from excessive force, and equal protection. However, such a finding is only half of the equation. To survive summary judgment in a municipal liability case, a plaintiff must also submit evidence sufficient to show that the municipality's own policy or custom was the "moving force" of the constitutional violations in question. *Monell*, 436 U.S. at 694. Thus, the Court now moves on to decide whether Plaintiff has created a genuine issue of fact as to this second step of the analysis.

A municipality is not liable under § 1983 on the theory of *respondeat superior*. *Id.* Rather, a municipality is liable *only* for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Here, Plaintiffs

16

aver that Defendant is liable for the paraprofessionals' constitutional violations based on its failure to adequately train them.[1] Such claims "can only yield liability against a municipality where that [municipality's] failure to train reflects *deliberate indifference* to the constitutional rights" of those it interacts with. *City of Canton v. Harris*, 489 U.S. 378, 386–92 (1989) (emphasis added). That is, a municipal defendant must have "actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). This is because "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

There are two ways of proving that a defendant's failure to train its employees amounts to "deliberate indifference" to the constitutional rights of those the municipality serves. *City of Canton*, 489 U.S. at 390 n.10. First, a plaintiff can establish notice if a violation occurs "so often" that a factfinder can infer from the *pattern* of violations that "the need for further training must have been plainly obvious to the . . . policymakers." *Id.* Second, there is a "single incident exception" where, even absent proof of a pattern, deliberate indifference can be inferred if a factfinder determines that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy. *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). Because Plaintiffs argue both of these methods in their briefing, the Court analyzes each in turn.

---

[1] Plaintiffs also mention failure to properly hire and supervise in their complaint. However, Plaintiffs do not make any argument as to hiring or supervision in their opposition brief; they only mention training. Because Plaintiff has abandoned these theories and offers no evidence to support them, the Court does not analyze them.

### 1. Pattern

The Fifth Circuit has explained that "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson v. City of Fort Worth*, 588 F.3d 838, 849-50 (5th Cir. 2009). "A pattern requires similarity and specificity." *Id.* at 851. It "also requires sufficiently numerous prior incidents, as opposed to isolated instances." *Id.*

Here, Plaintiffs make two arguments in support of their "pattern" theory. First, Plaintiffs allege that Principal Barton had "received complaints" about the three paraprofessionals such as that Bourgeois was "emotionally abusive," Cookmeyer displayed "consistent negativity" and "handled" students in a "physically abrupt" manner, and Rayer was "lazy." R. Doc. 72 at 25. However, Plaintiffs cite only to Principal Barton's notes and deposition testimony for these descriptions. *Id.* The Court has reviewed these exhibits and observes that these statements appear to be either personal observations made by Principal Barton or perhaps remarks made by other teachers and included in negative performance reviews. As far as the Court can tell, these general comments are not in reference to any particular incidents. Overall, such generic comments, without reference to any specific incidents, fall far short of the "similarity and specificity" required to prove deliberate indifference by repeated pattern of incidents. *Peterson*, 588 F.3d at 851.

Second, Plaintiffs more emphatically argue that the facts of this case *alone* demonstrate a "pattern" because "there are eight discrete incidents committed by three different employees within a period of just ten minutes." *Id.* at 24. Plaintiffs contend that "[t]he assistant principal herself admitted that this presents a pattern" because she testified on deposition that "As a parent,

I would assume that it probably had happened more . . . Because if it happened that much, it probably wasn't the first time." *Id.*

Unfortunately, however, Plaintiffs cite no case law in support of their argument that a "pattern" of violations sufficient to impute notice to the defendant can be found based only on a series of incidents occurring within a ten-minute period. The Court, in its own research, has not found a case within the Fifth Circuit addressing such an argument. However, other federal district courts, applying the same *Monell* standard, have uniformly rejected this argument. For example, in *Dubose v. City of Hueytown*, the district court found that a plaintiff failed to prove a pattern where he alleged that four officers committed various acts of excessive force against him in short succession:

> [Plaintiff] merely assumes that because incidents excessive force occurred on a single day involving multiple officers, then a lack of training, supervision, and discipline must have also occurred . . .
>
> Perhaps [Plaintiff] cites no supporting cases because the opinions of the United States Supreme Court and Eleventh Circuit do *not* support [his] argument that the unconstitutional acts of multiple officers on one date necessarily implicates their supervisor's failure to train or supervise or discipline; that argument is, in effect, calling for the imposition of *de facto respondeat superior* or vicarious liability, theories of liability that the Supreme Court and the Eleventh Circuit have repeatedly refused to impose under section 1983.

No. 15-852-S, 2016 WL 3854241, at *8 (N.D. Ala. July 15, 2016). Another court, addressing an identical argument, explained that:

> In the instant case, the relevant events took place within the span of a single day, in one unbroken series of events. Plaintiffs fail to cite, and this Court cannot identify any authority in which violations that occurred only a few hours apart, as part of the same arrest and detention, were considered separate incidents from which one could infer a pattern of violations. Adopting Plaintiffs' legal theory would blur the distinction between the single-incident and multiple-incident theories of liability for failure to train.

*Dillman v. Tuolume County,* No. 13-404, 2013 WL 3832736, at *5 (E.D. Cal. July 23, 2013).

Here, Plaintiffs do not cite, and the Court could not locate, any decisions reaching an opposite conclusion. And, the Court agrees with the reasoning of these courts: incidents all occurring within ten minutes are not sufficient to create a fact issue as to whether Defendant had "actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights." *Porter*, 659 F.3d at 446. Put simply, Plaintiff's failure to identify a single case accepting their novel theory of *Monell* liability (i.e., inferring a pattern from a series of nearly instantaneous actions) is fatal to their argument.

### 2. Single Incident

"[A]bsent proof of pattern, deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018). That is, "in a limited set of cases, a plaintiff, unable to show a pattern of constitutional violations, may establish deliberate indifference by "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003).

"The single incident exception, however, is a narrow one, and one that [the Fifth Circuit] ha[s] been reluctant to expand." *Id.* "Because 'virtually every' plaintiff alleging municipal liability can propose some training reform that would have prevented 'the particular injury-causing conduct,' [Fifth Circuit] caselaw has 'generally reserved' the single-incident method of proving deliberate indifference for cases in which the policymaker provides 'no training whatsoever' with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury." *Littell*, 894 F.3d at 625 n.5; *see also*

*Connick v. Thompson*, 563 U.S. 51, 67, (2011) (explaining that "nuance[d]" training deficiencies are inadequate to sustain a single-incident theory). *Id.*

Thus, the single-incident exception is reserved for where the defendant completely fails to train regarding (1) a "clear constitutional duty" (2) implicated in "recurrent situations" that (3) a particular employee is "certain to face." *Canton*, 489 U.S. at 396. For example, the Fifth Circuit found that the single-incident exception was viable where the plaintiff alleged that a school district provided its employees with no training whatsoever regarding the constitutional requirements for performing searches of students. *Littell*, 894 F.3d at 625. It explained that the "precise nature" of the Fourth Amendment's "constraints on searches" was "sufficiently clear in the law" because "[s]tudent searches are governed by defined principles such as the need for individualized suspicion, the nexus requirement, and the limit on unduly intrusive means." *Id.* Further, the Court explained that "the school district knew or should have known to a high degree of certainty that [the teacher in question] and other employees would be placed in situations requiring knowledge of Fourth Amendment search law." *Id.* And, the plaintiffs alleged that the defendant provided no training whatsoever as to this constitutional duty. *Id.*

However, mere failure to train in "one limited area" is not cognizable. *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 386 (5th Cir. 2005). For example, in *Sneed v. Austin Independent School District*, the plaintiff argued that single-incident liability was proper because the defendant school district provided no training on "harassment based on cultural issues" such as "implicit bias." 487 F. Supp. 3d 584, 596 (W.D. Tex. 2020). However, the plaintiff notably did not allege that the school district completely failed to train its employees with regards to its constitutional duty to refrain from discrimination or harassment. *Id.* Thus, the Court found that the plaintiff's alleged training defect was too particularized to sustain single-incident liability. *Id.*

Here, Plaintiff alleges that the single-incident theory of liability is cognizable because the paraprofessionals received no training on "how to guide blind children." R. Doc. 72 at 25. However, this is precisely the sort of nuanced training defect that goes to the "particular injury-causing conduct" at issue in the case rather than a wholesale failure to train as to a major constitutional duty. *Littell*, 894 F.3d at 625 n.5 "Guiding blind children" is not a "clear constitutional duty." *Canton*, 489 U.S. at 396. Put simply, Plaintiffs have failed to submit evidence showing that Defendant completely failed to train the paraprofessionals with respect to their constitutional duties to respect student's bodily integrity, refrain from excessive force, or afford students equal protection. Accordingly, this is not a single-incident case.

### iii. Although Plaintiffs' § 1983 Claims Fail at this Time, Summary Judgment is Premature.

As explained above, Plaintiffs three § 1983 claims fail at the *Monell* prong of the analysis. However, the Court notes that it has decided to stay this case pending the conclusion of the criminal proceedings against the paraprofessionals in question, so that they will be able to freely testify. Accordingly, highly relevant witness testimony is still outstanding. Indeed, the testimony of the paraprofessionals could well generate key evidence as to their history of committing similar violations and as to their training on the relevant constitutional duties. Accordingly, the Court will not grant summary judgment on Plaintiffs' §1983 claims at this time. Rather, it will deny Defendant's request for summary judgment without prejudice and allow it to re-urge the motion—either on the eve of trial or on a Rule 50 motion—should Plaintiffs fail to produce any further evidence that could cure the deficiencies noted above.

### C. Plaintiffs Have Viable ADA and LHRL Claims.

The Court now leaves behind Plaintiffs' § 1983 claims to address their ADA and LHRL claims. The Title II of the ADA focuses on disability discrimination in the provision of public

services. Specifically, Title II, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." ADA claims are viable under both a "conscious discrimination" theory and a "failure to accommodate" theory. *See Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1033 (5th Cir. 2022). And crucially, "the ADA . . . provide[s] for vicarious liability. This means that a plaintiff need not identify an official policy to sustain a claim against a public entity as it may be held vicariously liable for the acts of its employees." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023). The Louisiana Human Rights Law ("LHRA") is "modeled after the ADA." *Conine v. Universal Oil Prod. Co.*, 42,409 (La. App. 2 Cir. 9/26/07), 966 So. 2d 763, 767. Thus, when "interpreting the scope of the LHRA," courts "look[] to the ADA." *Cougle v. Berkshire Life Ins. Co. of Am.,* 429 F. Supp. 3d 208, 216 (E.D. La. 2019).

 Here, Plaintiffs argue theories of conscious discrimination and failure to accommodate under the ADA and LHRL. The Court takes each in turn before addressing vicarious liability.

### i.  Conscious Discrimination

In general, a plaintiff bringing suit under Title II of the ADA must prove that (1) he has a disability; (2) "he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity"; and (3) "such exclusion, denial of benefits, or discrimination is by reason of his disability." *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 235 (5th Cir. 2017). The plaintiff need not prove that the action was taken "solely because" of his disability. *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1024 (5th Cir. 2022). A "mixed motive" is equally unlawful. *Id.* at 1035. Thus, if a defendant acts for "two reasons"—one

legitimate and one discriminatory—then it violates Title II. *Id.* at 1035, n.14. The plaintiff "may only recover compensatory damages upon a showing of intentional discrimination." *Rideau v. Keller Indep. Sch. Dist.,* 978 F. Supp. 2d 678, 682 (N.D. Tex. 2013).

Here, the parties largely re-urge the arguments summarized above in relation to Plaintiffs' equal protection claim. That is, Defendants aver that there is "no evidence of discrimination or a discriminatory motive" on behalf of the paraprofessionals. R. Doc. 65-1 at 9. They claim that the video footage shows that "A.F.'s behavior was the trigger for an employee response." *Id.* Plaintiffs, for their part, connect the abuse to A.F.'s disabilities. For example, they argue that the paraprofessionals' telling A.F. to "figure out how to walk by himself" after taking away his cane supports a finding of disability-based animus.

The Court finds that Plaintiffs have presented viable ADA and LHRL claims. Similar to the equal protection context, the case law shows that where a teacher abuses a particular, highly disabled student but not other less disabled students, an ADA claim is potentially viable. For example, Plaintiffs cite *Rideau v. Keller Indep. Sch. Dist.*, 978 F. Supp. 2d 678, 683 (N.D. Tex. 2013). There, the court denied summary judgment where a severely disabled student incurred suspicious injuries suggestive of abuse while under the care of a particular teacher. The Court relied on this physical abuse as well as deposition testimony from witnesses who stated that the teacher was "impatient" and "forceful" with certain students and "often got more impatient with" those "students who required a lot [of] attention," than he did with "less needy" students. Here, the evidence summarized above in connection with Plaintiffs' equal protection claim—that A.F. was severely disabled as blind, nonverbal and autistic and that the paraprofessionals (1) only abused A.F. and not the less-disabled students, (2) called A.F. "ridiculous" and "bad" among other derogatory remarks (3) kicked, hit, and pushed A.F. and (4) were, per witness testimony, "way too

rough physically" with "*certain* autistic / impaired children"—also suffices for their conscious discrimination ADA theory. R. Doc. 72-8 at 3.

### ii. Reasonable Accommodation

Plaintiffs also bring their ADA claim of the basis of a failure-to-accommodate theory. "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quotation omitted). If the plaintiff proves those three elements, "the defendants are liable simply [for] denying [the accommodation]." *Bennett-Nelson*, 431 F.3d at 455. "Although these laws may require certain accommodations regardless of a defendant's intent, plaintiffs can only recover damages when a defendant engaged in intentional discrimination." *Phillips next friend of J.H. v. Prator*, No. 20-30110, 2021 WL 3376524, at *2 (5th Cir. Aug. 3, 2021). Courts have therefore held that "intentional discrimination requires at least actual knowledge that an accommodation is necessary." *Id.* "The requisite notice" can come from "facts establishing that the disability, resulting limitation, and necessary reasonable accommodation were 'open, obvious, and apparent' to the entity's relevant agents." *Paley*, 81 F.4th at 450.

Defendant maintains that there is no evidence that it failed to accommodate A.F., intentionally or otherwise. R. Doc. 65-1 at 9. It states that it "provided an Individualized Education Program to A.F." and "assigned an employee to A.F. to assist him with his disabilities." *Id.*

Plaintiffs argue that the paraprofessionals failed to accommodate A.F.'s disabilities in the context of the particular incidents at issue. They argue that A.F. clearly needed an accommodation to be assisted down the hallway to the cafeteria. R. Doc. 72 at 16. Plaintiffs argue that many reasonable accommodations were available to the paraprofessionals, such as speaking slowly and

25

calmly to A.F. or given clear and concise verbal directions. *Id.* Overall, they contend that "no reasonable jury could deny that the School Board had 'actual notice' that kicking and hitting an autistic and blind child because of his disability-related behaviors violates the ADA." *Id.*

The Court agrees with Plaintiffs. No one disputes that the paraprofessionals were aware that A.F. was blind, autistic, and non-verbal. Accordingly, his disabilities were "apparent" to the School Board's "relevant agents." *Paley*, 81 F.4th at 450. Further, Plaintiffs provide video evidence arguably showing the paraprofessionals taking A.F.'s walking cane away, striking him with it, and then bodily moving him down the hall rather than returning the cane. The Court finds that choosing to take away a blind child's walking cane, hit him with it, and make him walk without the cane is sufficient to support a claim for denial of reasonable accommodation.

### iii. Respondeat Superior

"[T]he Fifth Circuit [has] held that the ADA, unlike section 1983, does not require a policy, custom, or practice of discrimination by a public entity, and instead contemplates *respondeat superior* liability for the public entity based on the actions of its employees and agents." *Pena v. Bexar Cnty., Tex.*, 726 F. Supp. 2d 675, 686 (W.D. Tex. 2010). The precise contours and elements of the *respondeat superior* doctrine in the context of federal statutes generally, and the ADA in particular, is not immediately clear. However, the Fifth Circuit has broadly stated that "the public entity is liable for the vicarious acts of *any* of its employees as specifically provided by the ADA." *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574–75 (5th Cir. 2002). Here, Defendant does not dispute that the paraprofessionals were in the course and scope of their employment at the time of the incidents. In fact, in the context of Plaintiffs' § 1983 claims, Defendant itself urges that the paraprofessionals' actions were disciplinary and "pedagogical." Accordingly, the Court concludes that Plaintiffs' ADA and LHRL claims are viable as alleged against the School Board.

### iv. Jurisdiction

At this point, the Court briefly pauses to address its jurisdiction. At oral argument, the parties appeared to believe that this Court's continuing jurisdiction depended on the survival of Plaintiffs' § 1983 claims. Although the viability of the § 1983 claims is tenuous, as explained above, the Court now confirms that Plaintiffs have a viable ADA claim. Because the ADA is a federal statute, the Court's federal question jurisdiction is therefore secure. *See* 28 U.S.C. § 1331.

### D. Plaintiff's State Law Claims Are Viable.

Next, Defendant seeks dismissal of all of Plaintiffs' state-law claims. First, Defendant argues that all claims—negligent training, IIED, and battery—are insufficiently proven. Second, Defendant avers that it is entitled to immunity as to each of these claims pursuant to La. R.S. § 9:2798.1. The Court takes these issues in turn.

### i. Negligent Training

Plaintiffs' complaint does not specify a theory as to their negligence claim on behalf of A.F. However, Plaintiffs argue in their briefing that "the School Board is responsible for its own negligent training" and that it is "easy to connect the negligent training to the abuse." R. Doc. 72 at 18. Elsewhere, Plaintiffs urge that their negligent training allegations are based in the fact that the paraprofessionals received "no training on how to guide blind children." *Id.* at 25. Thus, Plaintiffs premise their negligence claim on the idea that the School Board itself is directly liable based on its own negligent training.

To be clear, a claim for negligent training under state law is completely different from the failure-to-train theory of *Monell* liability analyzed above. As explained by the Fifth Circuit, "Louisiana's test for whether a duty exists for these [negligent hiring and training] claims is different than the test for whether [plaintiff] states a *Monell* claim." *Gomez v. Galman*, 18 F.4th

769, 780 (5th Cir. 2021). That is, in the context of a § 1983 claim, a failure-to-train theory of *Monell* liability is a specific standard requiring a plaintiff to prove "deliberate indifference" by connecting a particular constitutional violation to a municipality's training inadequacies through either a pattern of similar incidents or the single incident exception. *See supra*, at 19-25. Conversely, a state-law negligent training claim is based in ordinary state negligence principles and requires no such formulaic and particularized showing. *See Warren v. Penzone*, No. 22-2200, 2023 WL 7686666, at *13 (D. Ariz. Nov. 15, 2023) ("[A] pattern of prior similar incidents is ordinarily required to establish the sort of deliberate indifference necessary to support a *Monell* claim. But such a pattern is not required to support a state-law negligent training claim. To prevail on such a claim, a plaintiff need only demonstrate 'that a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of the plaintiff's injuries.'").

Here, Plaintiff alleges that Defendant's training was inadequate because it failed to train the paraprofessionals on how to "guide blind children." Although this contention is inadequate to establish deliberate indifference in the § 1983 context, as explained above, the Court finds that it is sufficient to meet the lower, much less specific requirements of a state law negligence claim. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence"). Under Louisiana law, "[t]here are five elements to a negligence claim: duty, breach, cause in fact, legal cause, and damages." *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006).

Defendants only dispute the fifth element. They maintain that "even if [Plaintiffs] could demonstrate elements (1) through (4)," they cannot prove that A.F. sustained damages because they "have provided no medical bills, no evidence of past or future medical care, and no evidence of economic damages associated with the alleged incidents." R. Doc. 65-1 at 22.

This argument is unavailing. Plaintiffs present evidence from witnesses suggesting that A.F. was kicked and hit by the paraprofessionals, that his fingers and skin were twisted and turned red, and that his head was pushed into the table. R. Doc. 72 at 4-5. Such evidence is sufficient to support a finding that A.F. experienced pain and suffering, thus incurring damages. Defendant cites no law in support of its argument that seeking medical care is a requirement to prove the damages element of a negligence claim.

### ii. Intentional Infliction of Emotional Distress

Next, Plaintiffs bring IIED claims in their own right, alleging that Defendants breached a duty of care as to their response to the incidents and particularly by covering up the existence of video footage of the incidents. To recover for intentional infliction of emotional distress, "plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

Defendant argues that it cannot be found liable for intentional infliction of emotional distress as a result of its post-incident handling of the situation and its actions regarding the video footage. First, it urges that the video footage at issue was not a public record under Louisiana law. R. Doc. 65-1 at 23. It maintains that Plaintiffs had no entitlement to obtain the video and that they did not timely request to view the video. *Id.* Furthermore, they maintain that the evidence shows that Principal Barton and Assistant Superintendent Gardner "genuinely believed that the security footage was overwritten and unavailable for viewing" by the time Plaintiffs requested a copy. *Id.* at 24. Thus, this "good faith" mistake cannot constitute "outrageous" conduct for the purpose of an IIED claim. *Id.* at 23. Finally, Defendant argues that Plaintiffs have not presented any evidence that they in fact suffered severe emotional distress. *Id.* at 24.

In opposition, Plaintiffs argue that "whether [the videos] were 'public records' is besides the point, because the School Board did not refuse to produce the videos on this ground—rather, it told J.F. that the videos *did not exist*." Further, they maintain that Defendant undertook a variety of outrageous actions including as follows:

> First, J.F. directly emailed Mr. Cosse, Ex. U, and Mr. Cosse admits that he had requested the footage be archived, doc. 65-12 at 2 ¶ 11. Second, the School Board had motive to lie because, in Mr. Cosse's words, it was worried about the parents "press[ing] charges." Ex. C at 195; Ex. K. Third, Mrs. Barton lied to the police, saying that A.F.'s parents did not want to press charges, when in fact she had not even spoken to them yet. Ex. S; Ex. C at 257–67. Fourth, she downplayed the incidents to L.F., while behind the scenes she was recommending the most extreme sanction (termination). Ex. I; Ex. J; Ex. A at 73–74; Ex. B at 37–39. Fifth, when J.F. demanded answers, Mrs. Barton lied again, claiming she could not remember what happened or the date of the incidents, even though she presided over the just-cause hearings herself and took detailed notes. Ex. B at 42–45; Ex. J; Ex. C at 303–04. Sixth, the form Mrs. Barton gave J.F. to fill out was for *classroom* footage, when she knew that most of this occurred in the *common areas*. Ex. J. Finally, Mrs. Gardner told J.F. that the videos had been deleted. Ex. U. Although Mrs. Gardner claims she made an honest mistake, a reasonable jury could simply disbelieve [her] side of the story.

R. Doc. 72 at 20. Overall, Plaintiffs argue that these actions can sustain a claim for IIED because "parents send their children to school to learn and be safe" and "[t]he idea that a school would use deception to deprive parents the ability to view footage of abuse is stomach-turning." *Id.* at 21.

Further, as to their own emotional distress, Plaintiffs point to their own affidavits. L.F. states that "[t]he way my son was treated and the School Board's decision to cover it up has been emotionally devastating for myself and my family." R. Doc. 72-10 at 3. Additionally, J.F. states that "[s]ince the abuse, I have called myself a 'paranoid basket case' when it comes to my kids," and "I have lost countless nights of sleep because of the School Board's dishonesty regarding what happened and lying to me that the videos had been deleted." R. Doc. 72-11 at 5.

Clearly, factual disputes persist as to whether the School Board intentionally downplayed or covered up the incidents. Overall, the Court finds that a jury could possibly credit Plaintiff's theory that the School Board's actions were intentional. Neither party has directed the Court to an on-point Louisiana case where a court considered whether an alleged cover-up of student abuse can rise to the level of "outrageous" conduct sufficient to support an IIED claim. However Plaintiffs submit evidence that the School Board essentially attempted to downplay its employees' physical abuse of their blind and non-verbal son, going so far as to "lie[] to the police" regarding Plaintiffs' knowledge of the situation and to withhold video footage of the alleged child abuse. R. Doc. 72 at 20. Ultimately, the Court finds that whether this conduct rises to the level of "extreme" and "outrageous" is best left to a jury.

Plaintiffs also purport to bring a claim for "negligent" infliction of emotional distress. R. Doc. 72 at 19. However, "in Louisiana, there is no independent tort of negligent infliction of emotional distress." *Richardson v. Cella*, No. CV 12-1771, 2014 WL 12924980, at *1 (E.D. La. Mar. 10, 2014). Rather, emotional distress damages are merely an "element of damages" which may "aris[e] out of" other tort claims. *Kelly v. W. Cash & Carry Bldg. Materials Store*, 99-0102 (La. App. 4 Cir. 10/20/99), 745 So. 2d 743, 760. Accordingly, to the extent that Plaintiffs bring an independent claim for 'negligent infliction of emotional distress,' such claim must be dismissed.

### iii.  State Law Claim for Battery of A.F.

As to their battery claim, Plaintiffs seek to hold the School Board vicariously liable for the torts allegedly committed by the paraprofessionals. In determining whether an employer is vicariously liable for their employee's torts under Louisiana law, courts consider the following factors: "(1) whether the tortious act was primarily employment rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act

occurred on the employer's premises; and (4) whether it occurred during the hours of employment." *Baumeister v. Plunkett*, 95-2270 (La. 5/21/96), 673 So. 2d 994. Not all four factors must be met before liability may be found. *Id.*

Applying these factors, a school board can indeed be held vicariously liable for the batteries perpetrated by their employees against students. *See Doe*, 316 So. 3d at 1099 (School Board was vicariously liable for a janitor's rape of a student in a school bathroom because the janitor's "status, duties, and presence at the school facilitated his assault" of the child); *Buckley v. Tangipahoa Par. Sch. Sys.*, 2020-0668 (La. App. 1 Cir. 2/1/21) (holding that a school system could be vicariously liable where the plaintiff alleged that a teacher intentionally pushed him into a classroom door).

Here, Plaintiffs point out that the three paraprofessionals involved in the incidents are currently facing criminal charges for "simple battery of the infirmed in violation of La. R.S. 14.35.2." R. Doc. 72 at 11. They thus urge that Defendant's request for summary judgment of their battery claim is "frivolous." *Id.* at 18. The Court agrees. As to *respondeat superior*, Defendant itself argues that the paraprofessionals' behavior was for disciplinary and pedagogical purposes. Thus, Plaintiffs have a viable vicarious liability claim against the School Board for battery by the paraprofessionals.

### iv. Immunity

Finally, Defendant avers that it is entitled to immunity pursuant to La. R.S. § 9:2798.1 as to all of Plaintiffs' state law claims.[2] This statute provides that:

> B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

---

[2] The parties agree that this Louisiana immunity statute could *not* apply to Plaintiffs' federal claims, including its § 1983 and ADA claims.

> C. The provisions of Subsection B of this Section are not applicable:
>
> (1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
>
> (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

The case law has further developed a "two-step test to determine whether a public entity is entitled to immunity" under Section 9:2798.1B:

> First, if a statute, regulation, or policy prescribes a particular course of action, there is no choice or discretion involved, and the immunity does not apply. However, when discretion is involved, the court must then determine whether that discretion is the kind that is shielded by the statutory immunity, that is, discretion grounded in social, economic or political policy. Section 9:2798.1 protects the government from liability only at the policy making or ministerial level, not at the operational level.

*Doe v. ABC Sch.*, 2019-0983 (La. App. 1 Cir. 12/17/20), 316 So. 3d 1086, 1099.

Here, Defendant argues that its actions were "at all times reasonable and never criminal, fraudulent, or malicious." R. Doc. 65-1 at 7. Thus, it contends that "the Board's discretionary and policymaking actions, such as its investigation, personnel decisions, and adherence to policy" fall within the scope of the statute "especially considering the video footage in this case." *Id.* Accordingly, Defendant avers that it is immune as to "all" of Plaintiffs' state law claims, presumably including the LHRL, negligence, IIED, and battery claims analyzed above.

Crucially, "immunity under La. R.S. 9 :2798.1 is an affirmative defense and, as such, the party raising it bears the initial burden of demonstrating its applicability." *Gomez v. City of New Orleans*, No. CV 19-11803, 2023 WL 4351230, at *3 (E.D. La. July 5, 2023). Here, Defendant has not met this burden. Preliminarily, one fundamental flaw in Defendant's immunity argument is that it fails to assert the immunity with particularity as to each of Plaintiffs' state law claims. It

merely alleges that it is entitled to immunity as to all claims without explaining how the decisions underlying each particular claim are policymaking ones. This is problematic, because each of Plaintiffs' claims focus on distinct conduct and decisions, some made by the paraprofessionals (battery, LHRL) and others made by School Board personnel (negligent training, IIED).

Plaintiffs' claims for battery and violations of the LHRL target abusive conduct by the paraprofessionals. This is clearly conduct at the "operational," rather than "policymaking" level. *Doe v. ABC Sch.*, 316 So. 3d at 1099. The School Board certainly does not allege that it had a "policy" of allowing such behavior. Moreover, it is undisputed that the paraprofessionals are being criminally prosecuted. Thus, even if the conduct were somehow policymaking, it would fall within the exception prohibiting discretionary immunity for criminal conduct. La. R.S. § 9:2798.1(C)(2). Accordingly, discretionary immunity does not apply to these claims.

As to Plaintiffs' claims for negligent training and IIED, the Court can understand Defendant's argument that the School Board's decisions as to its training and its response to Plaintiffs' requests for information could have been exercises in policymaking discretion. Crucially, however, Defendant presents *no* summary judgment evidence in support of this assertion. It offers no evidence as to why these particular decisions were "grounded in social, economic or political policy" such that they were made at the "policymaking" level. *Doe v. ABC Sch.*, 316 So. 3d at 1099. If fact, Defendant does not actually identify who made the decisions or what particular decisions it seeks to protect as exercises in discretion. Accordingly, Defendant has not met its burden of proving the affirmative defense of discretionary immunity as to these claims at this time. However, as in relation to Plaintiffs' § 1983 claims, the Court observes that key evidence is still outstanding and that the case may be continued for some time. Accordingly,

Defendant may re-urge its discretionary immunity argument with more specificity on the eve of trial or on a Rule 50 motion after presentation of the evidence.

## V. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendant's motion for summary judgment, R. Doc. 65, is **DENIED** in part and **GRANTED** in part. The motion is **DENIED** with prejudice as to Plaintiffs' ADA claim, LHRL claim, and battery claim. However, the motion is **DENIED** without prejudice to Defendant's right to re-urge summary judgment at a later date as to (1) Plaintiffs' § 1983 claims on the basis of their continued failure to create a genuine issue on *Monell* liability and (2) Plaintiffs' negligent training and IIED claims on the basis of discretionary immunity. The motion is **GRANTED** as to Plaintiffs' independent claim for negligent infliction of emotional distress because such claim is not cognizable under Louisiana law.

**IT IS FURTHER ORDERED** that the instant case is stayed until July 25, 2025. A telephone status conference is **SET** for July 22, 2025 at 8:30 am. At that time, the parties may advise as to the status of the criminal proceedings. The parties are instructed to use the following dial-in information and to join the line five minutes before the scheduled time.

Dial in: 571-353-2301

ID code: 342767621

New Orleans, Louisiana, this 25th day of April, 2025.

HONORABLE ELDON E. FALLON